Good morning, Your Honor. Steve Jacobson from the Federal Defender's Office. I'm appearing for Jeffrey Davis. I'm going to be arguing the curtilage issue that applies to all three defendants, and then I would be splitting time with Robert Stone, who will be arguing the separate issue that only his client has, Richard Davis, with regard to the stop and search and statements issues. Have you allocated your time amongst one another? Well, we would like to try to split our time and save some for rebuttal. Okay. I would like to take less than 10 minutes and save a couple minutes, and we'll see how we do with that. All right. And Mr. Friedman gets left out, or is he? Mr. Friedman voluntarily, since he had another argument at this time. He's done his work for the day. Since he got up here before, he just said, forget it. Okay. He may get up and say something, but it's not planned that way. All right. Well, the issue that we've addressed in Jeffrey Davis's brief and at length in the court below concerns whether this very rural home site in southern Oregon, where there was a clearing on an 80-acre parcel where it's mostly very rough, very forested, hills and dales, some very wet creek areas, just everything there but living habitat, except for this one clearing where Mr. and Mrs. Davis made a home site, whether that clearing area, which consists of both a house, a pond, and a shop area, as they're stated, and those are accurate descriptions, whether that clearing containing those three areas are all part of the curtilage of the home. I'm looking at Government Exhibit 3. Is it your position that the entire cleared area shown on Government Exhibit 3 is within the curtilage? I don't think that if you go up, if they've gone up the road, the clearing does start earlier than when you get to the house. Right. I don't think that would be included in the curtilage. On Government Exhibit 3, I'm outlining the area that appears from the aerial photograph to be cleared. Is that your position, that the entire cleared area within Government Exhibit 3 is within the curtilage? Not quite. The distinction I was trying to make is that we're saying the home, the pond, and the shop. Here's the pond. Here's the shop. Here's the home. Now are we half of the—that's all curtilage? Yes, that is our position. That's all part of the living space integrated. How was the pond intimately connected with the domestic life of the homeowner? The pond was connected because it was used virtually as both a swimming pool. They put in through the generator, which was the first thing to go in over by the shop. They had an air system with the pond to try to keep the pond life. That was for the fish, right? That's to aerate the water so that the fish have lots of oxygen. Yes. Okay. That was for the fish. You're not suggesting that the fish are occupants within the meaning of the curtilage, are you? No, I wouldn't go quite that far. So maybe part of the pond, but not the whole pond. Well, the pond in this setting, my argument would be that the pond is no different than a swimming pool would be in a backyard. That's a heck of a swimming pool. Well, it's relatively large and about five times larger than the house. I wish I had a swimming pool that size. Well, luckily we don't. I mean, the pond is not a place that is important legally in the case. What's your best case? I mean, you're basically taking a position, which as I understand the curtilage cases, extend the temporal reach of curtilage far beyond, I think, what Blackstone ever envisioned. But maybe I'm wrong. What's your best case that curtilage extends this far? Well, I think you can get some hints from Dunn originally, which laid out these factors. Before Dunn, you had cases in some areas where they simply wanted to have a certain number of feet cut off. You can't go more than 100 feet. You can't go more than 75 feet. And the government cites those kinds of concepts in its brief. And Dunn really did away with that. He said you have to look at the context. There's not an automatic thing. We're weighing a lot of factors to see in this context, which is different than if you're living in a suburb of Portland or somewhere else. And so the best case I have is the Second Circuit case, which I cite, which is 375 feet, which is further. This map is not to scale, so I don't have any idea. I guess there's a distance shown from the house to the shop of roughly 180 feet. Yeah, the high 100s. And then if you go all the way to the other side of the shop where the smell was conducted, then you can get over 200 feet. Let me take your argument then. Assuming that we agree with you and that curtilage in applying the Dunn factors could be this broad, what do you do with the air vent, which is clearly outside the cleared area and in the brush and the forest? Well, I don't think it really is in the brush and the forest, if you look at it. You've got a picture of it. It's kind of hard to see. It's outside the fence. I have to give you that. It's outside the fence, but we are arguing that the fence itself is not a boundary to be used for curtilage purposes. If it was to separate the shop from the house, then we would simply lose at that point. I'm looking at, I guess it's 7i. I don't know whose exhibit that may be. It may be a defense exhibit. It may be a government exhibit. The vent itself is actually hidden underneath a tree, so you can't really say that that's cleared area, can you? There is a bush there. Well, it's a tree. It's a Douglas fir. It's not part of the forest that they had to tromp through. It is on the side. There is a bit of an embankment coming down from the shop, but it's not part of the forest that they came out of to the area of the pond and the shop. They were walking along the fence line looking down. One of the photos, I think the one you're referring to, is looking down the fence line at, yes. I don't know if you can see it from that. Your eyes are probably better than mine. In any event, the question that obviously I'm leading to is, how does the mouth of the vent, the end of the pipe, underneath the bow of the tree, outside the fence line, constitute an activity intimately connected with the domestic life of the homeowner? Especially when Davis himself testified he relies on the steep slope and the underbrush on the southern side of the pool to exclude people. Well, they had to come through. I'm not talking about that. I'm just talking about how he's talking about what he had done to exclude people. Now with Judge Tallman's question, given that background. Right. Well, let me try to address both. To get to this area, they had to come through something much steeper than what you're looking at in that picture. It was truly forested. They couldn't even take the video camera with them for most of that because it was so rough. I'm sorry I asked my question. I'd like to answer Judge Tallman's question. I was just trying to get his impressions of the kind of things he thought. Then Judge Tallman's question seems especially relevant. I think the argument we're making is basically geographical. It's so close to the shop. It's not part of the forest. Once you get in that clearing area, it should be considered curtilage. It's clearly connected to the shop. It's coming out from the shop. That's the argument. That is our best argument on that point. It's a tough argument to make if you're going to adopt the broadest view that you're urging us to adopt of curtilage. That's the toughest fact I think you have to overcome. I understand that, but I think it's the clearing of these essential parts of the home. You have all the activities, obviously. I think we have your curtilage argument in mind. If there's another point you want to make, go ahead. I'll save a minute or so for you. Okay. Mr. Stone? May it please the Court, I'm Robert Stone. I'm here on behalf of Defendant Appellant Richard Davis. And to the extent that Mr. Jacobson's arguments are applicable to Richard Davis, I would adopt those. At the district court hearing, although not in the brief or in the court's opinion, the additional issue for Richard Davis was whether or not he, as argued in the district court, had standing or had a privacy interest sufficient to complain about the search of Jeffrey Davis's property. I do think that he did. I'm not sure that it's necessary or terribly relevant. If the court should decide that these officers did in fact invade the curtilage, then that would become an issue. But as the government conceded at the hearing, nothing was found during the search of Jeffrey Davis's property that incriminated Richard Davis. The basis for the search of Richard Davis's properties that happened subsequent to that, based on different warrants, were his statements to Agent Wright and the items that were found in the search of his vehicle. So I'm prepared to try to address the standing issue, but unless the court has specific issues, I think... I think your argument is that if we agree with Mr. Jacobson that the curtilage was invaded, the search warrant was invalid, the officers had no right to be there, then there would never have been a confrontation with Richard Davis who arrived while that warrant was being executed, and therefore any statements that he made couldn't have been taken even under a Terry analysis. Yes. Does that encapsulate your argument? And to that extent, whether he had a privacy issue or a privacy interest sufficient to make that complaint would become an issue. Okay. Why don't you move to the Terry and Miranda issue? Okay. So as the government conceded, the actual basis for the subsequent search warrants were his statements and the items that were found in the search of his vehicle. The authority, the timing was that Richard Davis drove up onto the property during the time that the property was being searched. As best as I can tell from the transcript, the place had been pretty well secured. The GRRRA operation had been discovered. Richard Davis drove onto the property. He approached two reserve deputies, Aguanaga and Sarmento. We're not sure, based upon the testimony, whether he was patted down at that time or not, but at some point the officers took his identification, had him move his car, asked for identification, took his driver's license, retained that identification, and turned him over to Sergeant Selig, who was in charge of the operation, at least as far as Josephine County was concerned. Selig's testimony is that he read the warrant to him and then asked the reserve officers to search him. Neither reserve officer actually remembers searching Richard Davis, but according to Selig, after he read the warrant, Richard Davis was searched. A small tin of hash oil was found. He was then turned over to DEA Agent Wright, who confronted him with the evidence of the GRRRA, asked him what he knew about it. Richard Davis said everything. He then asked him a follow-up question about his helping. Richard Davis said he helped, and at that point he said, I want a lawyer, and the questioning ceased. I think he said he needed a lawyer and it would be two answers too late. Perhaps. I mean, is there any issue once he says everything, the game is over as far as his ability to say he's not involved? Well, it certainly becomes much more difficult that the officers didn't have probable cause then to search his vehicle, yes, and to subsequently search his property. So for me, for my purposes in trying to research this, the critical time was when they moved. Well, first of all, it's clear that the officers searched him, at least Selig, who was in charge. He searched him based upon the warrant. So to the extent that the warrant was overbroad, and that argument prevails, and I believe that that's Mr. Davis' one of his stronger arguments, that the warrant was overbroad. So if the search is based upon the warrant, I think it fails because the warrant was overbroad. Does that matter? Seeing as a couple minutes later he winds up responding to a question not about what was found in the search, but what's going on inside the shop, what's found there, and he gives it up. Well, to the extent that the questioning by DEA agent and his search based upon the warrant or the finding of the tin oil or the hash oil in the tin was based upon authority under the warrant, I don't think that my argument is that neither Agent Wright nor Agent Selig. Let's assume for the moment that the warrant can't properly apply to him and can't justify the search of his person. I'll take that as a premise. They find the hash oil, but they don't ask him about the hash oil. They ask him about what they found in the shop. So how is his answer to that question tainted by the fact they found the hash oil? Well, the question is whether DEA agent Wright had the authority under the warrant or under Terry or under Michigan v. Summers, some combination of those, to confront him with the evidence and question him about his knowledge of the marijuana grow. See, I think those are two separate things, to confront him with the evidence that they found. But I'm not sure that his answer, everything, is tainted by anything that happened before. Well, if they didn't have the authority to do anything, and this is what my position would be, that under the cases, well, under Terry, there wasn't reasonable, in order to ask him those questions, in order to question him, he was certainly at least detained under Terry or under Michigan v. Summers. He was detained whether he was in custody or not. So do the authorities, did DEA agent Wright have the authority, the ability, to ask him, to question him about his knowledge of the grow? And that's where it has to fail, I think, for Richard Davis. And I think it does fail there because under... Well, you do agree that if an individual has been detained incident to this warrant, the officers can ask him questions as long as they are just Terry questions, correct? No, I don't think that's correct. I think Terry questions require a reasonable suspicion of criminal activity. He comes onto the property, and he drives up, and it's my understanding, I guess you can cite me the case where I'm wrong, that in those particular situations where the warrant is valid to the situation, he's driving up, they can at least ask him Terry questions. They can determine his identity. They can try to obtain information confirming or dispelling their suspicions. That's in Burke-Byer v. McCarthy. And so at that point, you're suggesting that maybe searching him is wrong, but I guess that's why my colleague's question is important. The things they learned, if at all, from this search, valid or not, were not the questions he was being asked, and he voluntarily responded. I know everything about this marijuana grow out here. And I think the question is, and what I'm trying to posit for the court, is that there's a difference in the type of questioning that can be undertaken under Terry and under Michigan v. Summers. If, as the court said, this is a Terry stop, then they have to have a reasonable suspicion that he was involved in this criminal activity before they can ask him those questions. Before they can even stop and detain him under Terry, they have to have a reasonable suspicion that he was involved in these criminal activities. All they had was his presence there and the fact that he was Jeffrey Davis's brother. Mr. Summers, how do you respond to that line of cases that says that police officers have a right to engage in general on-scene type questioning? In this case, two reserve sheriff's deputies are providing security for the execution of a search warrant, and an unknown individual approaches the perimeter of the search scene. Are you saying that the deputies at that point are not permitted to simply ask, Who are you and why are you here? No, I'm not saying that. I think they can ask that. Well, they asked him for his identification. They did. Who are you? And essentially, what's your connection to the property? They can do that, and I believe that's the Michigan v. Summers line of cases that evolved from anybody that's in a house, you can detain during the time of the search. It didn't say you could search them. It said you could detain them during the search. Cases that evolved out of that have extended that to persons coming onto the property. And the component is for the safety and security of the officers who are executing the search, right? Yes, but the things that you can do under a Summers search are you can I didn't find any Ninth Circuit court decision that was directly on point. There is a Central California district court decision in Pulifiaco v. San Bernardino that discusses that issue, and the district court said that under Michigan v. Summers, when somebody comes onto the property, you can stop them, you can detain them, you can ask for their identification, and that's it. And that court specifically then dealt with the issue of a subsequent search of that person's vehicle, and the court declined to decide that issue, and that was because they couldn't tell from the testimony where there was something more than the person's presence on the property that allowed the deputies to go beyond stop, detain, identify. And that's what happened here. The officers went beyond stop, detain, identify. They had no particularized or no specific But now we're back to Judge Clifton's question. If they can conduct a pat-down to satisfy themselves that Mr. Richard Davis is not armed and therefore can't attack them, and they find a hashish container, a hard object, and then he admits that he's involved in everything, at that point don't they have probable cause to search his vehicle, independent of whatever the warrant may or may not have offered? Probably. I don't know that I would concede that, but I certainly concede that it's more difficult. But we don't know that they found the hash oil when they patted him down. As you look at the testimony, it appears what may have happened is there were two searches. Aguinaldo says that Sarmento patted him down right away, but the hash oil was found after the warrant was read to him by Seelig, and he told the reserve officers to search him. So at that point the search has happened. They've gone beyond stop, detain, identify, and have searched him. And if the hash oil leads to the questions and to the search of the car, then so be it. But I don't think they can get there, and that's my argument, based upon Summers, Terry, or the warrant. Okay. Thank you very much, Mr. Stine. We'll hear from the government. Good morning, Your Honors. Kelly Zusman appearing on behalf of the United States. May it please the Court. On the curtilage issue, Judge Aiken here actually made two distinct findings. One was that the detectives on the night of October 12th actually stayed on the perimeter, that they never encroached in the clearing itself. The observations that they made that were then included within the warrant were made from the ravine underneath, actually below where the shop was. The testimony is that they were approximately 256 feet away from the residence at that point when they made those observations. Alternatively, the district court looked at whether or not the shop itself was part of the curtilage and properly determined that it was not. It was within its own enclosure. There was a fence completely surrounding the shop area, which cut it off from the remainder of that cleared area. The proximity, the shop itself was between 180 and 200 feet away from the residence. So for both of those reasons, I think the district court here correctly determined that there was no encroachment of the curtilage by the detectives when they came out to surveil the scene. Unless there are any further questions on the curtilage issue, I'm going to move on to the reasonable suspicion for the Terry stop of Richard Davis. Well, as I understand it, the basis for the probable cause for the warrant was the anonymous tip, I guess two anonymous tips, to the Narcotics Task Force over a period of several months. A tip from a confidential informant. Informant. The smelling of the odor of marijuana as soon as they came through the locked gate and then hearing the generator, the moist air, smelling, growing marijuana from the end of this pipe under the bough of the tree. That's correct. And that's essentially the basis for probable cause, is that correct? That's correct. And there was no challenge to the probable cause supporting the warrant here. Now, while the officers are executing the warrant in this case, Richard Davis shows up. And I think you've heard a lot about the fact that this was an extremely rural area. This is literally in the middle of nowhere, in the middle of Grants Pass, Oregon. The property was 80 acres. It was surrounded by BLM land and a Girl Scout camp. It's not the kind of place that someone is going to stumble onto by mistake. Richard Davis shows up while they're executing the warrant. There are police vehicles all over the site. He doesn't just drive by. He also doesn't park down on the road and walk up. He actually drives his vehicle through the gate and parks right near the shop area. In his own testimony, he admits it's very vague, his memory on this. But he approaches two of the officers to ask what's going on. And I think all of the responses and everything that followed after that was entirely reasonable. Here they are in the middle of nowhere executing this warrant. This person shows up. He has to get through a locked gate to even get up there. And they later learn that, in fact, he's got a garage door opener that allows him to open the gate, and then the gate closes automatically behind him. He wants to know what's going on, and they tell him they're serving a search warrant. And the two reserve deputies who initially encounter him say, look, you've got to go have somebody read you the warrant. And that's what he does. He's referred to Sergeant Selig, who then reads him a copy of the search warrant. He's turned over to Agent Wright, who asks for identity, who are you, and has a discussion with him, very casual, informal. Even Richard Davis testified. They were polite. There was nothing overbearing. The district judge here said that, in fact, he was not confronted with evidence of his guilt. No one came to him and said, well, you were part of this marijuana grow operation, weren't you? That simply didn't happen. What they said was, which makes sense, hey, we just found a huge marijuana grow. It's a very sophisticated marijuana grow. There are over 100 grow lights. There are 3,288 plants filling the shop area. Well, they couldn't have known that at the time, right? They didn't know the exact number. They hadn't counted the plants yet. They didn't know the exact number at that time. But they had looked inside the shop, and as far as the eye could see, there were marijuana plants. You don't think that saying to Mr. Davis, hey, we just found all this marijuana grow in here, do you have anything to do with it, that's not confronting him with evidence? Not of his guilt. I mean, obviously. Well, it depends on how he answers the question. Exactly. I mean, he could well have been a family member who just happened to show up. I mean, they didn't know at that point. They had checked the property records, and they knew that the property was owned by Cynthia and Jeff Davis. So they had a pretty good idea that those two probably knew what was going on. The question itself, even Agent Wright testified he was surprised by the answer. He asked one follow-up question, and then Richard Davis says, I want to talk to a lawyer. All questioning ceases. And I think even today we've heard there's really no dispute that once they have that statement from Richard Davis, they have probable cause to search his automobile. And what they recover from the automobile, the two firearms, the cash, the snippers with marijuana residue, was sufficient probable cause to then do a search of Richard Davis' residence, which is located further up on Lower River Road. So for all of these reasons, what the officers did here was entirely reasonable. It makes sense. The questions that they asked, Richard Davis was never in custody. He was detained. He was not free to leave. But we have no Miranda violation. We have no Fourth Amendment violation. And I think Judge Aiken, I think she got it right here on all counts. Was the search of Richard Davis' vehicle pursuant to the search warrant or to the Carroll doctrine after Richard had made his incriminating admissions, and there was probable cause to arrest him for the marijuana grow operation? Both. And Judge Aiken found both apply here. He was searched the car was searched pursuant to the terms of the warrant and the automobile exception. And so this Court can affirm on either basis. Unless there are any further questions, I'll submit. I think not. Thank you, Ms. Sussman. Thank you. Mr. Jackson, I'll give you or Jacobs, I'll give you a minute on rebuttal. Thank you. Just a couple brief points. The government seems to be asking the Court to depend on the district court's opinion, and that's not the standard of review. Both parties have agreed that it is de novo review under these circumstances, so I don't think it's really. I want to make that point. I thought her point was that we could look to either basis, either the search pursuant to the warrant or to the Carroll automobile exception in order to uphold the search of Richard Davis. I was reacting only to her initial comments about the curtilage question. Okay. We're back to curtilage. I'm sorry. Judge Aiken made found findings about the curtilage, and I just wanted to remind the Court that that's really not the issue for this Court, because it is de novo review. I think on the three essential. Let me ask you a clarification. I struggled with our multi-judge opinion on the standard of review here. We must defer, absent a finding of clear error, must we not, as to the facts that the district court found at the evidentiary hearing? Because I don't know even on a de novo review how we overturn factual findings unless we find clear error. My understanding of what the Ninth Circuit has said, both in Johnson, although Johnson is unclear. Pick whichever opinion you like the most. Right. But then the later opinion just from a panel is that these are mixed questions of law and fact that are reviewed de novo. Okay. But even mixed questions of law and fact under our mixed question standard generally commands that we must defer to the fact finding, and then once we've decided what the facts are on de novo review, we apply the law de novo to those facts. Have I got it right, or did Johnson change the law on me? I think that concept could be applied, but I don't think it can be applied here because what Judge Aiken did in saying they didn't go on the curtilage, it's a legal conclusion. Okay. All right. All right. I guess my next question to you would be what fact, aside from the conclusion of curtilage, would you urge that Judge Aiken erred in finding that informed her legal conclusion that the officers did not violate the curtilage? Do you understand my question? Well, I understand it, but it's a mixed question of law and fact. Yes. That's the problem I'm wrestling with. What I think is set forth in our briefing, and I can try to summarize it, is that when going through the done factors and assessing them, she ignored totally all the testimony about the usage of the shop, for instance. And so there's no easy way to put this other than she didn't apply the facts to the law correctly, and the facts aren't in dispute. She, and apparently the government, according to the briefing, doesn't believe that testimony about usage after the fact can have any bearing, whereas the case law indicates that it can. Let me give you a for instance. We have a fence that surrounds the shop, but as I read the record, the testimony is that's to keep the dog in, and most of the time the gate was open so that the dog apparently had the free run of the curtilage. Yes. That's correct. Judge Aiken didn't make a finding on that. That's the only testimony about it. Okay. And this pipe, the end of the pipe that I'm so hung up on, is actually outside the dog fence, right? The pipe is outside the dog fence. It's about five feet there. I was looking at the picture that you were referring to. Underneath the bow of the tree. You can take a picture so that the bow interferes with it, but you also, from the previous page, as you look down the row, down the fence, you can see it, and it's not entirely covered up, and it's very close. I guess my best shot, you know, after thinking about it, is very similar to what I said then, and that is that this, the pipe is so close to the shop, obviously tied to the shop, and out of the forest that they had come through, so that it's in the clearing area, and that's why we think the curtilage concept should be applied. Okay. Thank you very much. The case just argued is submitted, and we will hear argument in the last case on the argument calendar, United States versus Casey Dale Mayer.
judges: Tallman, Clifton, Smith